In Ray Aluminum Warehousing, and there are five different case numbers, 21-643-651-660-663-954. And I understand both sides are splitting argument, and we'll begin with Mr. Brandt. Thank you, Judge Park. Good morning. May it please the Court, my name is Derek Brandt. I represent the plaintiffs' appellants referred to in the briefs as the individual plaintiffs, or IPs. That's Fujifilm, Kodak, Agfa, and Mag, who are industrial purchasers of primary aluminum at the applicable regional premium benchmark price. The District Court's summary judgment opinion should be reversed because the evidence bears out in this case, the assessment that this very Court made that, quote, these plaintiffs' injuries were a direct result of the defendants' anti-competitive conduct. Because the defendants manipulated the Midwest premium, the plaintiffs were forced to pay a higher Midwest premium. That's the end of the quote. It's at 936 F. 3rd 96. The first efficient enforcer factor asks... Well, if we said that, and we meant that, why did it get remanded for consideration of efficient enforcers? That's sort of determinative. Well, the District Court determined that it could address the efficient enforcer factor on summary judgment, Your Honor. Yeah. But, I mean, if we sort of established that, isn't the earlier opinion quite clear that we were talking only about antitrust injury and not about efficient enforcers? It is clear that that was what the Court was addressing in the Aluminum VI decision, Your Honor. But it's important to note that the hay was in the barn at the time. So it's direct for one purpose. Does that necessarily mean it's direct for another purpose under another standard? Well, it certainly is possible that a plaintiff can have antitrust injury without being an efficient enforcer. But that's not the case in this situation, Your Honor. The reason is the first efficient enforcer factor asks... How direct is the chain of causation between the defendant's antitrust violation, which here is price fixing of the regional premium, and the claimed injury of paying a higher regional premium? The answer is that that injury also is a direct injury because it occurs at the first step from the violation. The case is on a summary judgment record before this Court. And the evidence includes the fact that 29 different IP purchasing contracts or relevant pages of them were in the record before the Court. Twenty-eight of those contracts expressly priced the IP's aluminum purchases pursuant to the industry convention pricing structure of the prevailing LME cash price plus the applicable regional premium. The district court apparently ignored or drew inferences against that purchasing, accepting instead that many aluminum contracts did not expressly incorporate the premium. But this ignored the evidence that the IP's put before the district court. Well, let me just fast forward to our decisions after all of that that hold basically that contracts that incorporate benchmarks do not confer the first step sort of status to the counterparties in those contracts. How is this case not controlled by those? Well, most of those cases that I think Your Honor is referring to are the LIBOR cases, which I would submit are sui generis on their own, but also very different from this case, in the sense that LIBOR presented a situation where you had myriad different markets in which innumerable different derivative contracts might be tied to a benchmark premium that was available for anybody's use in any transaction. And very importantly, in the LIBOR context, there was no other suggestion that some other rationale or motivation might have influenced the defendant banks to have, excuse me, in this situation, in our case, there's no other suggestion of a rationale why the defendants manipulated the premium other than to manipulate this price in this single market for this single product in the aluminum world. How did those distinctions bear on the sort of first step analysis? Well, on the first step analysis... On the breadth of the market? Well, in many of those cases, the transactions in the LIBOR cases were in completely different markets. In the LADON case, which Your Honor, I think, authored, the transaction was in a derivative of the benchmark that was at issue. It was not even in the benchmark that was at issue, and Your Honor contrasted that against somebody who had actually transacted in the actual interest rate benchmark. How about platinum palladium? Yeah, platinum palladium, I think, is important for a couple of reasons. First, it confirms that there is no hard and fast rule that you have to have transacted directly with the defendant in order to have efficient enforcer status. But also, importantly, in platinum palladium, the plaintiff in the physical market was a seller of the metal. And so unlike here, where we are buyers, the seller, of course, has an opportunity to decide, am I going to incorporate this benchmark premium or not? Unlike here, in platinum and palladium, the evidence, at least quoted by this court, was that market participants frequently incorporated the benchmark into their contracts, and the spot price was often tied to the, or keyed to the benchmark. There's no indication that the physical seller could not avoid using the benchmark. But isn't that, I mean, you say the seller determines this. Isn't this a subject of potential negotiation? I mean, sellers don't dictate prices to buyers, necessarily, unless they are conspiring to fix the price themselves. Sellers set a price that buyers either like or don't like, and then there's some negotiation. And even if the benchmark is incorporated, isn't there undisputed evidence that then there are other fees and costs that may get added in or may not or are subject to negotiation? So the ultimate price that the buyer pays, I don't think the buyers usually care much how they get there. They care whether the price that is being sought is a price they're prepared to pay. Well, there's a few things in there, I think, Judge Lynch, and I'll try to address them. Taking the last point first, I think buyers do care which portion is which in the aluminum world anyway, because some prices can be hedged in the aluminum world and other prices can't be hedged in the aluminum world. There's evidence of that in the record. There's a wealth of evidence in the record that my clients both pleaded and then testified that the regional premium was a non-negotiable portion of their purchasing. That evidence- It could be offset by some other aspect of the pricing. Well, but I think that runs right into Gelboim. Any tampering or manipulation of a component of a price is price fixing, Your Honor. That's the law from Ciccone Vacuum in the 1940s through U.S. v. Apple from this circuit, Gelboim. But all of that is manipulation by the people who are in the relevant market, right? I mean, the evidence here is that the plaintiffs are buying mostly from smelters. In fact, the amount that they bought from anybody, they bought out of the warehouses, was so small that you were prepared to give it up as part of your case just to get the appellate review. The overwhelming majority, the totality for practical purposes, were bought from manufacturers of aluminum, smelters of aluminum, right? Well, that's right. And my clients bought purely from smelters. And we did not have any purchases from the warehouses. We didn't give up anything to get to the appellate record. There was one party that did, right? Yeah, I think that sounds correct. One of the class plaintiffs, perhaps. But the evidence in the case and the pleading was that our clients were unable to negotiate what the premium was. And the district court either ignored that or decided that because somebody else somewhere, sometime, was able to negotiate a premium with some supplier, that suddenly every purchaser in what is the same relevant market, Your Honors, the primary aluminum market, which is what Aluminum VI acknowledged, that suddenly every purchaser should have or could have negotiated away this existence of this manipulated premium. The district court might just as easily have inferred that the entire LME cash price structure should have been negotiated away from this. But this is the industry convention. What I don't understand is why, if the smelters are not in on the scan, if they're not part of the price fixing, what the smelter needs to do is to make a profit on the transaction, right? So as long as they exceed, the price that they set exceeds their costs, they have some running room as to what the ultimate price is going to be. So I'm not sure why it isn't in the interests of any given smelter to undercut the rest of the market and get all the business by charging a little less than most people are charging. Well, this is the industry convention in aluminum purchasing, and it was long before the premium price was manipulated. And as the defendants acknowledge in their brief, it is still the industry convention in the aluminum market, Your Honor. I see that I'm well over my time. I've reserved two minutes. Yeah, you've reserved a couple of minutes for a moment. Thank you, Your Honor. We'll hear from Mr. Huchek. Good morning, Your Honors. May it please the Court. We would adopt Mr. Brandt's comments with respect to the summary judgment issue. What I'd like to address this morning is the denial of the class certification based upon the district court's refusal to consider basically the same evidence that this court relied upon in what we've been calling Aluminum VI. Just so I understand the relationship between the two arguments, if we were to disagree with Mr. Brandt, then everything you're going to tell us is moot? Yes. That's what I thought. We were dismissed on the same summary judgment order that he just addressed. And we have basically the same evidence that as to our clients it wasn't negotiable. But on the other hand, if we agree with Mr. Brandt, then the next issue is the class action issue, and we'd have to consider that, and that's what you're here to talk about. That's correct, Your Honor. Thank you very much. So, Your Honors, the issue here is the district court's failure to consider evidence that was identified in this court's previous opinion as showing that the defendant's conspiracy or supported the notion that the defendant's conspiracy inflated a component price of aluminum. Now, just as a preliminary, you get a lot of comments from the district court and from the defendant saying this is an extraordinarily complex conspiracy, but it wasn't. In fact, it was sketched out in a single email that we refer to as the smart-ass plan. It wasn't the name that we came up with, but that's the way that it works. And basically, the conspiracy was effectuated by the financial defendants buying LME warehouse companies and then acquiring massive amounts of aluminum, billions of dollars. In fact, at one point, Goldman owned the equivalent of 25% of the U.S. national annual consumption. By owning all that aluminum and owning LME warehouse companies, they had the opportunity to manipulate the system. And they did so by greatly expanding the queue, the amount of time that it took for you to get your aluminum out of the LME warehouse and into the hands of consumers. It did that by virtue of these merry-go-round transactions, and they successfully expanded and lengthened that queue. In 2010, it was 40 days. At the end of 2014, it was up to 650 days. And that had the intended effect of vastly increasing the portion of the price that the Midwest premium comprised from 2.2% to 8% up to 20%. This court in the aluminum 6 case said, quote, evidence adduced by the plaintiffs supported their contention that the defendant's conspiratorial acts inflated a component of the price of primary aluminum. Close quote. So that's discussing the evidence, not merely the allegations. You know, the district court cited footnote three from the opinion saying the focus was on the allegations, but in fact this court discussed the evidence too. And the evidence that it cited was three statements from the various representatives of the defendant saying the purpose of the bottleneck was to inflate the Midwest premium. The district court, however, said that the very same statements that this court relied upon are simply not competent to opine on the sweeping economically complex propositions necessary to support class certification. And then it further decided it wouldn't even resolve the questions by saying there's good reason to hesitate before permitting either side of the lay divide to be treated as authoritative as to whether lengthening queues at the Metro Detroit warehouses unitarily worked price injury on first-level purchasers. Well, those options weren't available after this court's decision of finding the significance of that evidence. The cases that the district court relied upon, rail freight and acid coal, are completely distinguishable. Rail freight involves surcharges that the plaintiffs couldn't connect to the conspiracy. But this court drew that connection in Aluminum 6 by saying that our evidence supported the notion that they increased the price components. Are you taking on a little more than you need to? In other words, suppose I thought that this is a very highly disputable issue and it's going to be decided by expert testimony and so on, and maybe in the end of the day you lose. Isn't it still a common question? In other words, the evidence that's going to decide whether you're right or wrong may favor you or disfavor you at the end of the day. But it's going to be decided in bulk. It's a proposition about the market. It's not a proposition about any given plaintiff. So am I missing something? What we should be looking at is whether the question of how this did or didn't affect the market is a question that can be And that seems to me to be the big question in this case. That has to be decided in a way that would be a common question for every potential plaintiff. You're absolutely right, Your Honor, and you're correctly stating Second Circuit law, which says that the plaintiffs don't have to show that they're going to prevail on the question. They just have to show that it's common. That it's a common question, and eventually the next step, that that common question outweighs the other individualized questions. That's absolutely correct. And our problem here with the District Court's opinion is it just refused to consider this evidence. I think it has to be considered, and as Gelboy made clear, both corrupting a price component and corrupting the beginning point of price negotiations is antitrust injury. That's the issue that should be decided in common, and that the District Court declined to decide and declined to consider the evidence that the plaintiffs offered. I see that I'm over my time, unless the Court has any further questions I'll submit. Thank you, Counsel. We'll hear next from the police. Mr. Peppermint first. Good morning, Your Honor, and may it please the Court. Rick Peppermint on behalf of Goldman Sachs, and I'm going to address the summary judgment issue on behalf of all defendants. And I'd like to use my time to go through four arguments that I believe my friend, Mr. Brandt, raised in his argument. First, I want to address his reliance on this Court's previous decision in Aluminum VI and pick up on Judge Lynch's comments that injury can be direct for one purpose but not direct for another. In Aluminum VI, this Court held that the injury was direct for purposes of antitrust injury because the plaintiffs alleged that the defendants restrained the primary aluminum market and that the plaintiffs suffered injury in that market. But we know from this Court's efficient enforcer decisions that simply being a participant in the allegedly restrained market and suffering injury in that market is not sufficient to make injury direct for purposes of efficient enforcer standing. And I'll just refer the Court to four previous decisions. First, Platinum and Palladium, where the plaintiffs clearly were participants in alleged injury in the allegedly restrained market. Also, American Express anti-steering. And if you go back before that, in IQ Dental Supply and in PACOM, in all of those cases, the plaintiffs were participants in the allegedly restrained market, but that was not enough to make their injury direct for purposes of efficient enforcer standing. The second point my friend Mr. Brandt makes is that the IP plaintiffs, these plaintiffs, allegedly had no choice but to pay the Midwest premium. I think Mr. Brandt referred to it as being non-negotiable. If that's the case, if that's true, that was the smelter's decision. It was the smelter's decision not to negotiate the Midwest premium. It was the smelter's decision to insist on including that as a price component. I thought it interesting in Platinum and Palladium when the Court was addressing the role of non-party sellers, referencing, and this is on page 260 of the Court's opinion, that the only transactions that were required to adopt the benchmark prices were those into which the defendants had entered as part of the fixing. There's no allegation here and no evidence here and no argument here that the smelters were required to adopt the Midwest premium. Yeah, I was asking questions along the line of that of Mr. Brandt, but let me push on it a little bit. That seems to me would work if we were just talking about spot purchases in the market, but isn't the evidence that most of these contracts are long-term supply contracts? So once you've decided that you're going to have a ten-year contract and the smelter's going to supply all of Company X's aluminum needs for that ten years, and the price is then set by reference to a benchmark, and then people manipulate the benchmark in such a way that the price, which is now no longer, I mean, it could be renegotiated, I suppose, but now there's a contractual right for the smelter to make that money. It's not like, gee, maybe I could undercut this price a little bit and get new contracts. It's more, I've got a contractual right to whatever the benchmark price is. Your Honor, I believe that this Court addressed that exact same issue in Schwab, Schwab 2. Because in that case, there was an argument that plaintiffs had entered into loan agreements before LIBOR was suppressed. It's like the bond, the long-term bond issues. And I believe that the Court in that case, that that fact can have relevance to the third efficient enforcer factor as to whether the damages are speculative. Because there, you don't have to confront the but-for issue that had the benchmark not been suppressed, what would the other components of the agreement be? So that was relevant to the speculativeness of damages point. It was not relevant, as the Court decided the issue, to the first efficient enforcer point, which is typically determinative of whether the injuries are direct. The only other point I would make, two things I think they're noting, is one, the plaintiffs try to characterize the four decisions that this Court handed down on efficient enforcer standing after Judge Engelmeyer ruled, and indeed after the opening briefs were filed in this case, as all about LIBOR. And, you know, LIBOR is sui generis, and LIBOR can apply in multiple different markets. And I just don't think you can make that argument after Platinum and Palladium. Because in Platinum and Palladium, it was not a ubiquitous benchmark. I mean, no one would claim that the fixing for Platinum and Palladium is this ubiquitous benchmark that applies in myriad markets. And there, the Court basically followed Schwab too, notwithstanding it was a single market, narrowly used benchmark. Now, my friend, Mr. Brandt, responds, well, you know, in Platinum, the plaintiffs were sellers, and that makes it different. And I think, Judge Lynch, you are correct that when you're talking about negotiated agreements, it takes to the tango and the fact that the plaintiffs are sellers shouldn't be determinative. But what I think the key issue for those were was that the transactions at issues, the defendants, the alleged conspirators, had no role in those transactions. They had, the defendants had no input into whether the allegedly manipulated benchmark was used in the transaction. And the defendants received no benefit from those transactions. Indeed, under plaintiffs' theory of the case, defendants' conspiracy here is not dependent at all on whether smelters in unrelated transactions with third parties use the Midwest premium. And the last thing I'll say in closing to the Court, and Mr. Brandt and I were referring to this beforehand, this litigation now has been around for over 10 years. We've been through two district judges. This is our third visit up to the Court of Appeals. Judge Lynch, my second visit to see you. The plaintiffs that purchase aluminum directly from the defendants, Reynolds and Southwire, the defendants entered into confidential settlement agreements with those plaintiffs, and those cases have been dismissed. I mean, this is the last leg of the litigation. And if the Court were to affirm on summary judgment, this litigation would be over. Thank you, Your Honor. Thank you, Counsel. Mr. Wick. May it please the Court, I'm Robert Wick, speaking for all defendants on the class certification issues. The district court's order denying class certification should be affirmed for two principal reasons. First, as to the documentary evidence, the district court correctly found that the documentary evidence offered by the first level purchasers did not satisfy the Rule 23b3 predominance requirement. The district court found that that evidence was, quote, too imprecise, indiscriminate, and disconnected from reliable factual moorings, end quote, to prove injury and causation on a class-wide basis. There was no abuse of discretion in that finding. Second, the district court was also correct in holding that the chain of expert models Excuse me, that very finding that you just referred to, isn't that the essence of the summary judgment ruling as well? That if it's, I mean, isn't what the Court is really relying on there is the idea that this isn't very good evidence for an effect on the plaintiffs here as being directly affected? No, Your Honor. The class certification denial came before the summary judgment ruling, and the reasoning is independent. The district court said, among other things, that the common documentary evidence, in essence, it fails to prove that injury and causation are common questions. It doesn't prove that. And one reason the district court cited as to why it doesn't prove that is because even if the first level purchasers come along at trial and they say to the jury, here's a stack of documents. Now, please decide injury and causation for each member of a large and diverse class of purchasers. The defendant's case will be that the broad generalization set forth in those documents are not true for large numbers of purchasers and purchases. The defendant's case, regardless of what their case is, will be a series of individualized challenges to the existence of injury. Secondly, Your Honor, the district court found correctly that the documentary, there's a whole series of steps in the chain of causation that the documentary evidence just doesn't address at all. It's completely inconclusive as to whether any given class member was injured or not. I'll cite one of those steps. The very first step in the chain of causation that the first level purchasers are arguing is that the alleged conspiracy lengthened the queues at the time each purchaser made its purchases. Well, the documents don't begin to answer that question at all, let alone answering it for each individual purchaser. The conspiracy they're alleging is one to cancel more warrants to make queues longer, and they need longer queues at the time each individual purchaser made its particular purchases. But the documents don't answer that because warrant cancellations, by their very nature, the district court found, are occasional, sporadic, and lumpy. They are on-again, off-again things. And to make matters even more complicated, the first level purchasers allege that sometimes the alleged conspirators conspired to cancel fewer warrants and make the queues shorter. That's what the defendants allegedly did when they entered into these so-called non-destocking agreements. Those are alleged agreements not to cancel warrants at each other's warehouses. So the documentary evidence can't tell us whether the queues are longer or shorter than they otherwise would have been at the time any given purchaser made its purchases. If you hand the jury a stack of documents, which implies that if indeed there was a conspiracy, it sometimes shortened the queues and it sometimes lengthened the queues, and then you ask the jury, okay, tell me which purchasers are injured, the jury has no idea what to do with that. The only evidence in the case that even attempted to answer the question, were the queues longer or shorter at the time of any given purchase, was the modeling evidence. And the district court found correctly that for four independent reasons, the models were defective and therefore did not succeed in proving that injury and causation were common questions as opposed to individual questions. Those four independent findings that the models were defective are as follows. First, the models failed to control for the doubling of the LME's minimum loadout rule and they thus misattribute to the alleged conspiracy the effects of the doubling of the minimum loadout rule. Second, the models impermissibly rely on the Vlissingen queue when a district court order had specifically excluded the Vlissingen queue as a proper theory of injury in this case. Third, that by the way makes this case just like the Supreme Court's Comcast case. Third, the models mask the existence of unharmed class members by averaging so-called excess loadouts over a six-year period rather than attempting to estimate the effects of excess loadouts at the time any individual purchaser made its purchases. Fourth, the models also mask the existence of unharmed class members by estimating a single average effect on price rather than the effect on the entire price, including all price components, of any individual purchaser. Any one of those four findings of fact would be sufficient to disqualify the models as viable common proof of class-wide injury. They would have to prove that the plaintiffs to obtain reversal would have to prove that all four of those findings of fact were wrong under a clear error standard and I would respectfully suggest that they have not shown that a single one of those findings of fact was erroneous at all, let alone under a clear error standard. Unless there are further questions I can address, we'll rest on our briefs for the remainder of the arguments. Thank you, Mr. Leib. We'll hear from you, beginning with Mr. Brandt, reserved ten minutes. Thank you, Your Honor. As discussing the long history of this litigation, I think it's important to note that, in fact, fact discovery was complete before this court last saw the case and decided the Aluminum VI decision. And when this court decided Aluminum VI, it commented on the evidence that was in the case, noting that the, quote, maximizing profits around premiums was central to the defendant's business strategy, end quote, and quoted the defendant's executives on this very point. That's at 936F3rd 97 and footnote 4. So this was the very purpose of the manipulation of the Midwest premium, which makes this case, even on the directness factor, different from the Schwab case that Your Honor asked about, Judge Park. The point of me pointing out that all of the IP's contracts had the benchmark regional premium in them is to demonstrate that the injury occurred at the first step after the manipulation of the premium by the defendants. That is to say, no smelter had to say, hey, look at this increase in prices in the market. Let's match it. The premium is the benchmark. It's in the contract. It went up immediately at the first step as it was manipulated by the defendants. Now, the first step language, as I'm sure everyone knows, comes from the Amex anti-steering case. In an Amex anti-steering, there were actually two steps, and the plaintiff did not have efficient enforcer status because it failed that test. In Amex anti-steering, Amex first raised the rates on its own customers by using its anti-competitive practices, and the plaintiff alleged that this allowed the plaintiff's contracting partner to then later raise its rates on them. That's not the case here. The benchmark went up, and plaintiffs were injured at the first step. This is also unlike the IQ Dental and PACOM decisions that Mr. Pepperman referenced. Both of those cases dealt with derivative injuries. In any event, there's no space between the district court's summary judgment ruling against the IP's and institution of a per se privity rule requiring that the transactions must be with the defendants in order for there to be efficient enforcer standing. This is not a situation where smelters looked at the market and then raised their prices under the protection of an umbrella. It's a market-wide benchmark. It was fixed at the very first step. The plaintiffs had the benchmark in their contracts. It was then and remains today the industry pricing custom. As Judge Lynch pointed out, some contracts even predated the fixing of the benchmark. The plaintiffs are purchasers here, not sellers. There's one single market with one single product, and where there's been no other proffered rationale for why this price fixing was executed than that the defendants wanted to earn money on this particular price in this particular market, selling this particular commodity, there's no reason why the IPs are not efficient enforcers. There are no floodgate concerns here. This is not LIBOR. As Mr. Pepperman mentioned, we are 10 years into this, and we're down to a handful of plaintiffs in this case. Simply put, these plaintiffs have the most direct antitrust injury that any plaintiff could possibly have short of transacting in privity with the defendants, and if the court does not reverse the summary judgment order, I believe it's fair to say that the law in the Second Circuit will be that one has to have acted in privity with the defendants in order to be an efficient enforcer, notwithstanding the creed and decades of other Second Circuit jurisprudence. Thank you. Thank you, Mr. Pepperman. Thank you, Your Honor. I'll just briefly hit some points my friend Mr. Wick made. He never discussed the not competent finding that the district court made, which is it can't be reconciled with Romanum VI. So basically this court doesn't need to reach all those other issues. It needs to send the case back to the district court to resolve the issues posed by Ed Evans in the first instance. With respect to the individual challenges to injury, the allegations here and the evidence is that they corrupted a price component and or the beginning point of negotiations. The injury occurred right there. You don't need individual inquiries to determine whether or not there's an injury when it's already established ad initio. With respect to the warrant cancellations, their warrant cancellations, lumpy as they were, succeeded in expanding the queue from 40 days to 650 days. So I think a jury could easily evaluate that evidence on a common basis. With respect to making the queues shorter by agreeing not to destock each other, they made the queues longer by the merry-go-round transactions, not by the failure to discount. And then finally, I'm not going to go into all of the expert testimony, but we briefed each of the four points that my friend Mr. Wick made, and none of them have merit. If there are no further questions, I'll submit. Thank you, counsel. Thanks to all of you. We'll take the case under advisement.